# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERTO RODRIGUEZ,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>SCOTT KERNAN,<br><br>　　　　Respondent. | Case No. 1:17-cv-01040-DAD-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On October 10, 2014, Petitioner was convicted after a jury trial in the Kings County Superior Court of: false imprisonment, simple assault, assault by means of force likely to cause great bodily injury, assault with intent to commit a sexual offense, sexual penetration with a finger by force, and robbery. (CT[1] 134–45). The trial court sentenced Petitioner to a total imprisonment term of fifteen years and eight months. (CT 273). On November 2, 2016, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Rodriguez, No. F070850, 2016 WL 6472106, at *1 (Cal. Ct. App. Nov. 2, 2016). The California Supreme

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on October 19, 2017. (ECF No. 11).

Court denied Petitioner's petition for review on February 15, 2017. (LDs[2] 5, 6).

On August 4, 2017, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). In the petition, Petitioner raises the following claims for relief: (1) lack of notice regarding the false imprisonment offense; (2) the trial court's failure to *sua sponte* instruct the jury regarding proper use of circumstantial evidence in accordance with CALCRIM No. 224; (3) ineffective assistance of counsel; and (4) sentencing error. (ECF No. 1 at 4–5).[3] Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 10, 15).

## II.

## STATEMENT OF FACTS[4]

At trial, K.D. testified that she was returning to her apartment in downtown Hanford around 7:00 p.m. on August 11, 2013, after walking around the corner to a store for soda and cigarettes. The way to the rear entrance of the building passed through an alley at the side. As K.D. entered the alley, some men standing by a car and a pickup truck catcalled at her. Rodriguez walked up to K.D., put his arm around her, and pulled her toward him. K.D. pulled away from him and walked faster, but Rodriguez matched her pace and pulled her toward him again as the car followed them with the passenger door open. K.D. tried to reach an area near the rear entrance to the building where there were lights and people inside might hear her screaming for help, but Rodriguez pulled her toward the car and said something about coming to a house. When K.D. said "no," Rodriguez punched her head and face repeatedly with his fists. K.D. tried to guard her head by crouching against a cement wall, but Rodriguez continued hitting her, causing her face to strike the wall.

K.D. testified that Rodriguez then squeezed her neck with his hands until her vision blacked out. She regained consciousness but could not stand and collapsed on the pavement. As Rodriguez tried to get on top of her, K.D. crawled up against the wall and curled herself into a fetal position to try to stop him from raping her. He pulled her pants down to her knees and pulled her underpants part of the way down. K.D. felt his finger and another object—something smooth and cool—in her crotch. The finger and the object penetrated inside the flesh at the opening of the vagina.[5]

---

[2] "LD" refers to the documents lodged by Respondent on October 19, 2017. (ECF No. 11).
[3] Page numbers refer to ECF page numbers stamped at the top of the page.
[4] The Court relies on the California Court of Appeal's November 2, 2016 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[5] K.D.'s testimony on direct examination about exactly how Rodriguez penetrated her was as follows:
   "Q. Okay, when you felt this object where did it go?
   "A. Where did it go?
   "Q. Yes.
   "A. Right in my vagina. [¶] ... [¶]
   "Q. ... So I don't mean to get graphic with you, but do you use tampons?
   "A. Yes.
   "Q. This item that you described, would it be—did you feel it in the same place that you would put a tampon?

Rodriguez withdrew his hand from K.D.'s crotch. She testified, "He stopped. He stood over me, he looked just like in shock, like how is she still fighting, that was kind of like the look he had on his face." Then he grabbed her purse. She tried to hold on to it, but then let go after a few seconds, hoping he would leave. K.D. saw Rodriguez walk away toward the car, carrying the purse. She had a cut above her eye, multiple bumps on her head, a swollen face, an abrasion under her arm where her purse strap had been, bruises on her arms, and a burning sensation in her vaginal area. The purse contained a cell phone, a prescription medication, a lipstick, and a wallet with $22 in cash.

K.D. identified Rodriguez, as he sat in the courtroom, as the perpetrator of the attack.

Some neighbors who had heard K.D. scream came out to the alley and found her lying injured on the ground. One testified that K.D. said her attacker "did stick his fingers in her."

Dr. Mark Hoffman examined K.D. at a hospital around 9:00 the same night. He testified that K.D. told him a man attacked her, threw her to the ground, strangled her, pulled her pants down, and placed his fingers and another object inside her vagina. He examined her and found injuries on her head, neck, arm, knee and back, all consistent with her description of the attack.

Patricia Driscoll, a registered nurse, testified that she performed a sexual assault examination on K.D. that night at 1:15 a.m. In addition to the injuries on other parts of K.D.'s body, Driscoll found redness on K.D.'s outer labia and posterior fourchette.[6] During the examination, K.D. reported pain inside and outside her vagina. When Driscoll put a speculum in place for the examination, K.D. cried out that it hurt. This was not a normal reaction for an uninjured patient. Driscoll opined that her findings were consistent with penetration by a finger or other object. On cross-examination, she stated the injuries to K.D.'s vagina could have been caused by an object used during consensual sex. She also said "[a]nything is possible" when asked whether the speculum could have been a cause of K.D.'s

---

"A. Yes.
"Q. So it went inside of you?
"A. No, it was just right there at the edge, you know, where like your perineum is, right there.
"Q. So it would be right at the opening of where you put your tampon?
"A. Yeah, like he wasn't able to get it all the way in because I was clenching my legs and, you know, fighting back.
"Q. Okay, you said you also felt his fingers?
"A. Yes.
"Q. Where on your body did you feel his fingers?
"A. In my vagina area.
"Q. Okay, when you describe your vagina area, would you say that his fingers went into the same spot that you described the smooth object going into?
"A. Yes."

On cross-examination, defense counsel asked whether the area where the object and finger went was "inside your vagina or outside?" K.D. answered, "It is right outside and inside, it is just a thin skin right there, you know, it is where a baby comes out and it stretches right there." The prosecutor again asked whether the place where the finger and object went was "inside your vagina, or somewhere else?" K.D. said, "It was inside but, you know, there was force there because my legs were shut so tight when it was happening because I was fighting against it...."

[6] The posterior fourchette is a fold joining the inner labia at the posterior of the vulva. (Steadman's Medical Dict. (25th ed. 1989) pp. 615, col. 1, 620, col. 1.)

sensation of pain during the exam. Further, a blunt force trauma inflicted through clothing could have caused the injury to the fourchette.

Dr. Hoffman also testified about photographs of K.D.'s injuries taken during Driscoll's examination. He opined that the abrasions on the fourchette were consistent with forcible sexual contact. During consensual sex, the area of the fourchette relaxes and retracts. In a sexual assault, however, the area constricts and is often injured. He also stated the fourchette is inside the vagina.

Ruben Vega testified that he was with Rodriguez and two men named Hernan and Eduardo on the night of the attack. They went to a bar and played pool. Afterward, they went out to the parking lot where Vega's pickup truck and Hernan's car were parked. A woman walked by and Rodriguez or Eduardo called out to her. Rodriguez approached the woman. Hernan drove slowly up to Rodriguez and the woman, his passenger door open. Vega backed away from them in his truck and left the parking lot. He heard someone scream as he left.

While Rodriguez was in custody, detectives interviewed him through a Spanish-language interpreter. A video recording of the interview was played for the jury. In it, Rodriguez admitted he had an encounter with K.D. on the night of August 11, 2013. In his version of events, when he met her in the alley after leaving the bar, he asked her if she wanted a ride. She told him to meet her further down the alley, and when he did, she offered to have sex with him for money. He said he had $24 and she said she would take it. When he began touching her, however, she became angry, said she did not want to have sex "like this," and slapped him. He became angry, pushed her down, took her purse, and ran to his friend's car. He said he was not sure why he took the purse. He said he was drunk and did not have a very clear memory of the encounter, but he denied putting his hand inside her pants, pulling her pants down, or knocking her head against the wall. Rodriguez did not testify at trial.

A business near K.D.'s apartment building was equipped with surveillance cameras, which made video recordings of the attack. The recordings were played for the jury. They are not included in the appellate record.

Detective James Edlund interviewed K.D. twice. The first interview was on the night of the attack, August 11, 2013, and the second was the day before trial, October 6, 2014. Defense counsel examined Edlund in an effort to bring out discrepancies between K.D.'s statements in the first interview, the second interview, and her trial testimony. K.D. told Edlund the men's catcalling included "kissing sound[s]," but in her testimony she said she did not recall saying this. She told Edlund that Rodriguez pulled her underpants to the side but testified that he pulled them down. She testified that Rodriguez said something in broken English about going to a house, but did not mention this in her first interview with Edlund. In the first interview with Edlund, K.D. said Rodriguez placed his hand on her shoulder and then moved it to her waist. In the second, she said he grabbed her shoulder. In the first interview, she said Rodriguez grabbed her breast. She did not mention this in the second interview.

Edlund testified he did not remember K.D. saying during the second interview that she felt Rodriguez's finger and another object on her vagina or that she felt his fingers in the place where she inserts a tampon, although her trial testimony included these statements. Subsequently, however, the parties stipulated that K.D. did say these things during the second interview.

Defense counsel also pointed out that Driscoll, the nurse, testified K.D. said Rodriguez told her he was going to abduct her. K.D. did not tell Edlund this.

Rodriguez, 2016 WL 6472106, at *1–3 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Kings County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id.</u> In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125 (2008)); <u>Panetti v. Quarterman</u>, 551 U.S. 930 (2007); <u>Carey v. Musladin</u>, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. <u>Musladin</u>, 549 U.S. 70; <u>Wright</u>, 552 U.S. at 126; <u>Moses</u>, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial,

the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Uncharged False Imprisonment Offense

In his first claim for relief, Petitioner asserts that his conviction for felony false imprisonment violates due process because the offense was not charged and it is not a necessarily lesser-included offense of the attempted kidnapping charge. (ECF No. 1 at 4, 20). Respondent argues that the state court's rejection of this claim was reasonable because Petitioner received adequate notice and waived any notice problem. (ECF No. 10 at 20).

Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst, 501 U.S. at 806.

In denying Petitioner's claim challenging his false imprisonment conviction for lack of notice, the California Court of Appeal stated:

> Contrary to the language on the verdict form, false imprisonment is not a lesser offense included in attempted kidnapping. A perpetrator can be guilty of attempted kidnapping even though no false imprisonment took place because the perpetrator failed in his attempt to restrain the victim's movement. Rodriguez argues that, for this reason, the jury could not properly find him guilty of false imprisonment, since only attempted kidnapping was charged in the information. Rodriguez is mistaken. As we will explain, his failure to object to the jury instructions on false imprisonment amounted to his implied consent to submit that charge to the jury, and consequently that conviction was appropriate even though it was not charged and was not a lesser offense included in a charged offense.
>
> Ordinarily, due process principles would be offended if a defendant were convicted of an offense that is neither charged in the accusatory pleading nor

necessarily included in a charged offense. (*People v. Lohbauer* (1981) 29 Cal.3d 364, 368–369; *People v. West* (1970) 3 Cal.3d 595, 612.) There is an exception to this rule when a defendant consents to the jury being instructed on an uncharged offense. (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 622; *People v. Geiger* (1984) 35 Cal.3d 510, 526 (*Geiger*), overruled on other grounds by *People v. Birks* (1998) 19 Cal.4th 108, 136 (*Birks*).) A defendant can be deemed to have given consent when the court proposes to instruct the jury on an uncharged offense and the defendant makes no objection. (*People v. Toro* (1989) 47 Cal.3d 966, 978 (*Toro*), overruled on other grounds by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3; *People v. Mata* (2013) 57 Cal.4th 178, 186 (*Mata*).)

That is precisely what happened in this case. After the parties concluded their presentation of evidence, the court and parties discussed jury instructions on the record. At the end of this discussion, the court asked defense counsel, "[A]re the instructions as in your possession at the current moment acceptable to you?" Defense counsel said yes. The packet of instructions included an instruction on false imprisonment in accordance with CALCRIM No. 1240. When the court read this instruction to the jury, defense counsel did not object. Given ample opportunity to object to the submission of the offense of false imprisonment to the jury, the defense elected not to do so and thus impliedly consented.

Rodriguez suggests a somewhat convoluted reason why we should not hold he impliedly consented to the instruction even though he did not object. He maintains the holding of *Toro, supra*, 47 Cal.3d at page 978—that a lack of objection can be construed as an implied consent in this situation—has been effectively overruled. This argument is based on the facts that *Birks, supra*, 19 Cal.4th at page 136, overruled one of the holdings in *Geiger, supra*, 35 Cal.3d 510, and *Toro* cited *Geiger*.

The argument fails because the proposition in *Geiger* overruled by *Birks* had nothing to do with implied consent via failure to object. Instead, it was about a defendant's right to insist on a jury instruction on a lesser, nonincluded offense. (*Birks, supra*, 19 Cal.4th at p. 136 [defendant has no such right].) Rodriguez says *Toro* "based its conclusion that the defendant impliedly consented to the charge in part on the absolute right of a defendant to demand lesser related offense instructions," but this is not correct. *Toro* based its conclusion in part on the view that instructions on such charges can be beneficial to a defendant, who consequently might wish to accept them without objection when proposed by the prosecution. (*Toro, supra*, 47 Cal.3d at pp. 974–975.) The *Geiger* court thought this view helped to show that a defendant should have the right to demand such instructions. (*Geiger, supra*, 35 Cal.3d at p. 529.) That there turns out to be no such right does not mean the instructions cannot be beneficial to a defendant or that this benefit fails to support the rule on implied consent.

If there were any doubt that *Toro* remains good law on the point at issue, it would be dispelled by *Mata, supra*, 57 Cal.4th at page 186. There our Supreme Court stated: " 'Assent' ... encompasses positive agreement as well as passive concession. Our discussion of implied consent in [*Toro*] also supports this conclusion. In *Toro*, we held that consent to instructions on an uncharged lesser related offense could be inferred from defense counsel's failure to object, and that such failure to object 'bar[s] a contention based on lack of notice.' [Citations.]" (*Ibid.*) This is a post-*Birks* reaffirmation of *Toro*'s holding on implied consent.

Rodriguez next contends *Toro* is distinguishable. He says that in *Toro* the court was motivated in part by indications in the record that Toro effectively conceded

he was guilty of some offense. Toro's counsel conceded during closing argument that Toro stabbed the victim. (*Toro, supra,* 47 Cal.3d at p. 977.) Rodriguez argues that he, by contrast, never admitted he did anything to restrain K.D.'s liberty. In his police interview, he only said he agreed to pay her for sex and then stole her purse. We do not read *Toro,* however, as holding that implied consent arises only when a defendant admits he is guilty of some offense related to a charged offense. Declining to object to an instruction on a lesser, nonincluded offense can be a wise backup strategy even when a defendant's primary goal is acquittal of all charges. Defense counsel could reasonably have found it wise in this case. Rodriguez admitted to police he was the person who committed a crime against K.D. in the alley that night, and the jury saw surveillance video of what he did. If the video showed him restraining or trying to restrain her, giving the jury a third option between finding him guilty of attempted kidnapping and finding him guilty of no offense involving restraint was a sound plan. The implied consent rule is applicable.

*Rodriguez,* 2016 WL 6472106, at *4–5.

"No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." <u>Cole v. Arkansas</u>, 333 U.S. 196, 201 (1948). Here, however, the state court found that Petitioner impliedly consented to the jury being instructed on an uncharged offense, thereby effectively waiving his right to notice.

The Supreme Court has "recognized that 'the most basic rights of criminal defendants are . . . subject to waiver." <u>New York v. Hill</u>, 528 U.S. 110, 114 (2000) (quoting <u>Peretz v. United States</u>, 501 U.S. 923, 936 (1991)).

What suffices for waiver depends on the nature of the right at issue. "[W]hether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). For certain fundamental rights, the defendant must personally make an informed waiver. See, *e.g., Johnson v. Zerbst,* 304 U.S. 458, 464-465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (right to counsel); *Brookhart v. Janis,* 384 U.S. 1, 7-8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (right to plead not guilty). For other rights, however, waiver may be effected by action of counsel. "Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has-and must have-full authority to manage the conduct of the trial." *Taylor v. Illinois,* 484 U.S. 400, 417-418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). As to many decisions pertaining to the conduct of the trial, the defendant is "deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' " *Link v. Wabash R. Co.,* 370 U.S. 626, 634, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (quoting *Smith v. Ayer,* 101 U.S. 320, 326, 25 L.Ed. 955 (1880)). Thus, decisions by counsel are generally given effect as to what arguments to pursue, see *Jones v.*

*Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), what evidentiary objections to raise, see *Henry v. Mississippi,* 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), and what agreements to conclude regarding the admission of evidence, see *United States v. McGill,* 11 F.3d 223, 226-227 (C.A.1 1993). Absent a demonstration of ineffectiveness, counsel's word on such matters is the last.

Hill, 528 U.S. at 114–15.

Petitioner has not identified, and the Court has not found, any Supreme Court case setting forth what suffices for waiver of notice of a lesser offense. When a Supreme Court case "does not 'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court . . . it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision." Moses, 555 F.3d at 754 (alterations in original) (citations omitted). The state court's denial of Petitioner's notice claim was not contrary to, or an unreasonable application of, clearly established federal law,[7] nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

## B. Instructional Error

In his second claim for relief, Petitioner asserts that his convictions for assault with intent to commit sexual penetration (count 6) and sexual penetration (count 7) must be reversed because the trial court failed to *sua sponte* instruct the jury on the proper use of circumstantial evidence. (ECF No. 1 at 4, 31). Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 10 at 21).

Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court

---

[7] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker v. Small, 665 F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's instructional error claim, the California Court of Appeal stated:

> Rodriguez argues the court erred because it did not, on its own motion, instruct the jury with CALCRIM No. 224, which states:
>
> > "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.
> >
> > "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."
>
> As we will explain, giving this instruction would have been inappropriate under the circumstances. There was no error.
>
> The principles relevant to this instruction are not in dispute and are concisely stated in the bench notes to the instruction. The trial court has a sua sponte duty to give the instruction "if the prosecution substantially relies on circumstantial evidence to establish any element of the case." (Bench Notes, CALCRIM No. 224 (2016 ed.), p. 63.) But there is no such duty "when the circumstantial evidence is incidental to and corroborative of direct evidence." (Ibid.) In fact, this type of instruction can be confusing and *ought* not to be given if circumstantial evidence is "not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct...." (*People v. Anderson* (2001) 25 Cal.4th 543, 582 (*Anderson*) [discussing similar CALJIC instruction].)
>
> Rodriguez's contention is that the medical testimony about K.D.'s injuries was circumstantial evidence that she was sexually assaulted. He says this evidence was equally consistent with two conclusions: that Rodriguez assaulted K.D. and inflicted the injuries with his fingers (as the jury found), or that K.D. sustained the injuries in some other way, such as through rough consensual sex with her boyfriend or a traumatic impact of some kind. Rodriguez further argues that, although K.D.'s testimony was direct evidence she sustained the injuries via Rodriguez's assault, the medical testimony was "more than just corroborative" of K.D.'s testimony. In Rodriguez's view, it was prejudicially erroneous not to give CALCRIM No. 224 under these circumstances.
>
> The medical testimony was merely corroborative of K.D.'s testimony, however, for K.D.'s testimony was the "primary means by which the prosecution [sought] to establish" Rodriguez's guilt of a sexual offense. (*Anderson, supra*, 25 Cal.4th

at p. 582.) "[B]y introducing circumstantial evidence merely to corroborate an eyewitness, the prosecution did not substantially rely on such evidence," and the court's omission of the instruction was correct, just as in *Anderson*. (*Ibid.*)

Rodriguez's own argument tends to show not only that the court was not required to give the instruction, but that giving it would have been error. He says, "Without CALCRIM [No.] 224, the jury could not have known that the circumstantial evidence had to be not only consistent with guilt, but also irreconcilable with any other rational conclusion...." But CALCRIM No. 224 obviously is not intended to require acquittal whenever circumstantial evidence is consistent with innocence, even though there is primary direct evidence that suffices to prove guilt.

Rodriguez, 2016 WL 6472106, at *5–6.

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147. "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). This standard also applies to omitted instructions, Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001), but Petitioner's "burden is especially heavy because no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

Although the jury was not instructed with CALCRIM No. 224, the trial court did instruct the jury:

Both direct and circumstantial evidence are acceptable types of evidence to prove *or disprove* the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence.

(CT 154; 5 RT 914) (emphasis added). The trial court instructed the jury that circumstantial

evidence is acceptable evidence to disprove any element of a charge, and as noted by the California Court of Appeal, "CALCRIM No. 224 obviously is not intended to require acquittal whenever circumstantial evidence is consistent with innocence, even though there is primary direct evidence that suffices to prove guilt." Rodriguez, 2016 WL 6472106, at *6.

In light of the victim's testimony, which constituted direct evidence regarding Petitioner's guilt, the trial court's instruction that circumstantial evidence can disprove elements of a charge, and the fact that CALCRIM No. 224 would not require acquittal if circumstance evidence is consistent with innocence, the omission of CALCRIM No. 224 did not "so infect[] the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147.

The Court finds that the state court's denial of Petitioner's instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law,[8] nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

## C. Ineffective Assistance of Counsel

In his third claim for relief, Petitioner asserts that trial counsel was ineffective by failing to request CALCRIM 355, which instructs the jury not to consider for any reason the fact that a defendant did not testify. (ECF No. 1 at 5, 42). Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 10 at 24).

This ineffective assistance of counsel claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal.

---

[8] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at 1148 n.1 (citing Early, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

> Rodriguez next contends his trial counsel rendered ineffective assistance by not requesting an instruction in accordance with CALCRIM No. 355, which states:
>
>> "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."
>
> The trial court has no duty to give this type of instruction on its own motion. (*People v. Lewis* (1990) 50 Cal.3d 262, 282.) Rodriguez did not request it.
>
> To establish ineffective assistance of counsel, a defendant must show that counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; see also *People v. Hester* (2000) 22 Cal.4th 290, 296.) When determining whether counsel's performance was professionally unreasonable, we must consider whether the appellate record affirmatively shows this or whether, by contrast, it is possible that considerations not appearing in the record could have justified counsel's conduct. If the situation is simply that nothing could justify the attorney's action, then we can find ineffective assistance on direct appeal; but if counsel could have had a tactical reason for acting as he or she did, and this reason does not appear in the record, then the matter should be addressed instead in habeas proceedings, where a record of counsel's reasons can be developed. (*People v. Pope* (1979) 23 Cal.3d 412, 425–426, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10; *In re Dennis H.* (2001) 88 Cal.App.4th 94, 98 & fn. 1; *People v Plager* (1987) 196 Cal.App.3d 1537, 1543.)
>
> In this case, it is possible defense counsel could reasonably have believed CALCRIM No. 355 would have been harmful to Rodriguez's interests. As Rodriguez is aware, our Supreme Court has stated that an instruction on a defendant's refraining from testifying can be undesirable from the defense perspective because it can direct the jury's "attention to the fact that the defendant is not testifying at the same time that it cautions the jury not to draw any adverse inferences from such failure to testify." (*People v. Stanley* (2006) 39 Cal.4th 913, 966.) Defense counsel might reasonably choose not to highlight a defendant's silence.
>
> Nothing in the record in this case is inconsistent with the conclusion that counsel made that choice at trial. Rodriguez now says the jury could have wondered why he made a statement to the police but was silent at trial, and the instruction could have deterred any adverse speculations they might have made about this. It is just as likely, however, that the video recording of Rodriguez's statement to the police satisfied the jurors' desire to hear him giving his side of the story, and that CALCRIM No. 355 would only have stoked suspicions about his in-court silence that would not otherwise have occurred to them. Since the record does not reveal

counsel's reasoning on the matter, it would not be appropriate on direct appeal to find ineffective assistance based on the omission of a request for the instruction.

Rodriguez, 2016 WL 6472106, at *6–7.

## 1. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, 134 S. Ct. 10, 13 (2013)). When this "doubly deferential" judicial review applies, the inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

2. Analysis

The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). As noted by the California Court of Appeal, one tactical reason for not requesting an instruction in accordance with CALCRIM No. 355 would be to draw less attention to the fact that Petitioner did not testify. Petitioner has failed to overcome the presumption that counsel's action might be considered sound trial strategy.

Under AEDPA's "doubly deferential" review of ineffective assistance of counsel claims, Donald, 135 S. Ct. at 1376, the Court finds that the state court's decision denying Petitioner's ineffective assistance claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Based on the foregoing, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

### D. Sentencing Error

In his fourth claim for relief, Petitioner asserts that the trial court erred in failing to stay punishment on count 5. (ECF No. 1 at 5, 50). Respondent argues that this claim is not cognizable in federal habeas corpus and that the state court's denial of this claim was reasonable. (ECF No. 10 at 28).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's sentencing error claim, the California Court of Appeal stated:

### *III. Section 654*

#### *A. Assault with intent to commit a sexual offense*
Rodriguez maintains the court should have applied section 654 to stay punishment on count 5, assault with intent to commit a sexual offense, because it was committed as part of the same course of conduct and with the same criminal objective as count 6, sexual penetration by force. The People concede the two offenses were part of the same course of conduct and were committed pursuant to the same objective, but argue that a statutory exception to section 654 justified the imposition of multiple punishments. We agree with the People.

Section 654 provides, in part, as follows:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

This statute bars multiple punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective. (*People v. Bauer* (1969) 1 Cal.3d 368, 376; *In re Ward* (1966) 64 Cal.2d 672, 675–676.)

Section 667.6, however, on which the trial court expressly relied, operates as an exception to section 654. (*People v. Hicks* (1993) 6 Cal.4th 784, 796–797 (*Hicks*).) Subdivision (c) of section 667.6 provides in part:

"In lieu of the term provided in Section 1170.1,[9] a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion. A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e). If the term is imposed consecutively pursuant to this subdivision, it shall be served consecutively to any other term of imprisonment, and shall commence from the time the person otherwise would have been released from imprisonment."

Count 6, sexual penetration by force, is one of the offenses listed in section 667.6, subdivision (e). The trial court therefore was authorized to impose a sentence for count 6 consecutive to the sentence for count 5 (and the other counts) despite section 654.

Rodriguez avers that section 667.6 no longer operates as an exception to section 654 because of an amendment to section 667.6 in 2006. In 1993, when *Hicks, supra,* 6 Cal.4th 784, held that section 667.6 created an exception to section 654, section 667.6, subdivision (c), included the following language: " 'In lieu of the term provided by section 1170.1, a full, separate, and consecutive term may be imposed for each violation of [specified sexual offenses] ... *whether or not the crimes were committed during a single transaction.*' " (*Hicks, supra,* at p. 790, italics added.) In 2006, Proposition 83 amended the statute. (Prop. 83, § 11, as approved by voters, Gen. Elec. (Nov. 7, 2006).) The changes included replacing the italicized language with the following: "if the crimes involve the same victim on the same occasion." (§ 667.6, subd. (c).)

According to Rodriguez, this change is significant because *Hicks* relied on the earlier language. The *Hicks* court explained that in one version of the bill that became section 667.6, the passage here in question read " 'whether or not the crimes were committed with a single intent or objective or during a single transaction.' " The phrase "with a single intent or objective or" was deleted from the bill as enacted. (*Hicks, supra,* 6 Cal.4th at p. 792.) After reviewing the legislative history, the court concluded: "Although it is unclear why the Legislature removed the reference to 'a single intent or objective' from section 667.6(c), the only reasonable explanation for its retention of the phrase 'whether or not the crimes were committed during a single transaction' is that the Legislature intended to create an exception to section 654 that would allow multiple punishment for separate criminal acts committed during an indivisible course of conduct." (*Id.* at p. 793.) Rodriguez says this reasoning means the change effected by Proposition 83—from "whether or not the crimes were committed during a single transaction" to "if the crimes involve the same victim on the same occasion"—deprives the statute of its effect of creating an exception to section 654.

The change does not have the significance Rodriguez attributes to it. The phrase "if the crimes involve the same victim on the same occasion" in section 667.6, subdivision (c), contrasts with "if the crimes involve separate victims or involve the same victim on separate occasions" in section 667.6, subdivision (d). Subdivision (c) *allows* consecutive sentences in the situation described there (a consecutive term "*may* be imposed"), while subdivision (d) *mandates* consecutive sentences (a consecutive term "*shall* be imposed") (italics added). In allowing multiple punishments in one class of cases and requiring them in another, the

---

[9] Section 1170.1 includes provisions stating how consecutive terms ordinarily are to be calculated.

voters can hardly be deemed to have intended to abolish them in the former class by reimposing section 654's restrictions.

Rodriguez's point could be that an "occasion" is possibly a longer, more encompassing occurrence than a "transaction," and that the voters meant to say that, while consecutive sentences might be called for when a defendant is guilty of enumerated crimes taking place during multiple transactions during a single occasion, section 654 should still be applied to bar multiple punishments if multiple enumerated crimes are committed within a single indivisible transaction. Rodriguez has pointed us to nothing that would indicate the voters had this rather unlikely intent, however.

### B. False imprisonment

Rodriguez argues the court should have applied section 654 to stay the punishment for false imprisonment in count 1 because it was part of the same course of conduct and pursuant to the same objective as the assault and penetration in counts 5 and 6. We review under the substantial evidence standard the court's factual finding, implicit or explicit, of whether or not there was a single criminal act or a course of conduct with a single criminal objective for purposes of section 654. (*People v. Coleman* (1989) 48 Cal.3d 112, 162; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1408.)

Felony false imprisonment requires the perpetrator to restrain the victim's freedom of movement by "violence, menace, fraud, or deceit." (§ 237.) Fraud and deceit are not at issue here. Rodriguez claims the only time the evidence showed he used violence or menace was when he began striking her, and his acts of striking her were part of the same course of conduct, and had the same objective, as his sexual assault and forcible penetration.

The record does not support his contention. K.D.'s testimony supported the conclusion that Rodriguez restricted her freedom of movement almost from the very beginning of the encounter. After the catcalling, Rodriguez walked up to K.D. and pulled her to him with his arm while his associate followed them up the alley in a car with the door open. Rodriguez's arm interfered with K.D.'s movement while the car limited her path of retreat. Few people isolated in an alley would not feel menaced by behavior like Rodriguez's up to that point. The jury was instructed, in accordance with CALCRIM No. 1240, that "[m]enace means a verbal or physical threat of harm. Threat of harm may be express or implied." Rodriguez does not claim this is an incorrect statement of the law. The court could reasonably find Rodriguez's acts at the beginning of the encounter were an implied threat of harm.

Further, the court could reasonably find that, at this early point, Rodriguez had an objective separate from the objective of sexually assaulting and forcibly penetrating K.D. In his statement to the police, Rodriguez said that, at the beginning of the encounter, he thought K.D. was a prostitute and his intent was to pay her for consensual sex. The court could reasonably find, based on this evidence, that Rodriguez's initial objective when falsely imprisoning K.D. was to corner her for the purpose of proposing and consummating this transaction. It could further find that his intent to force himself on her developed later, when she turned out not to be a prostitute. Thus, the court could reasonably find Rodriguez falsely imprisoned K.D. at the beginning of the encounter with one objective, and assaulted her later with another, distinct objective.

Rodriguez cites *People v. Matian* (1995) 35 Cal.App.4th 480 for the proposition that felony false imprisonment by menace can be established only by evidence that the defendant used a deadly weapon or verbally threatened harm, and therefore his conduct at the beginning of the encounter could not be a basis for a separate punishment for false imprisonment because he had not yet committed false imprisonment at that time. We do not read *Matian* as supporting this view. The court in that case merely observed that published cases of felony false imprisonment "generally" involved a deadly weapon or an express threat and that the only evidence of menace in the case before it, which it found insufficient, was the facts that the defendant had committed sexual assaults against the victim a short time before and then glared at her and got up from his chair when she tried to leave. (*Id.* at pp. 485–487.) This is not a holding that there is no such thing as menace consisting of a threat of harm implied by a course of behavior. We think any woman approached by a stranger in an alley in the manner in which Rodriguez approached K.D. would rightly consider herself threatened by a quite specific and severe type of harm, the type that in fact ensued in this case.

Rodriguez, 2016 WL 6472106, at *7–9 (footnote in original).

Whether the punishment for count 5 should have been stayed pursuant to California Penal Code section 654 is an issue of state sentencing law that is not cognizable in federal habeas. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."). Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 19, 2018**   _____

UNITED STATES MAGISTRATE JUDGE